UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

RAJU MEGANATHAN, et al         \*                Case No: 1:13-cv- 497
                Plaintiffs
                                    \*

vs.                                \*
                                    \*

SIGNAL INTERNATIONAL, LLC, et al,
                        Defendants   \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

OBJECTION TO MAGISTRATE'S REPORT AND RECOMMENDATION TO
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P.12(B)(2)
OF MALVERN C. BURNETT, THE LAW OFFICES OF MALVERN C. BURNETT, A.P.C.,
AND GULF COAST IMMIGRATION LAW CENTER, L.L.C.,

May It Please the Court,

     Defendants, Malvern C. Burnett, the Law Offices of Malvern C. Burnett, APC, and the Gulf South Immigration Law Center, LLC, (hereinafter referred collectively to as "Burnett) herewith object to the Report and Recommendation of the Magistrate Judge on the Burnett Defendants' Motion to Dismiss for lack of jurisdiction over the person of the Burnett Defendants.

     Burnett objects to the Magistrate Judge's findings and resultant recommendations.  The Report and Recommendations assert that jurisdiction exist over Burnett under both 1) the nationwide service provisions of RICO, and 2) traditional contacts analysis, based on the allegations of Plaintiffs' complaint.  Burnett submits that for both of those determinations the Magistrate Judge relied on conclusory statements found in Plaintiffs' Complaint, which cannot be used to establish a prima facie case  that personal jurisdiction exists over Burnett.  See <u>Panda Brandywine Corp v Potomac Electric Power Co.</u>, 253 F. 3d 865, at 868 (5th Cir. 2001).  Further,

Burnett objects to several findings implicit in the Magistrate Judge's Report and Recommendations, that, as will be shown below, are incorrect.

As to jurisdiction based on the nationwide service provisions of RICO, Burnett submits the Magistrate Judge's determination that due process concerns in a case such as this are "somewhat irrelevant" is also incorrect. In fact, contrary to the Magistrate Judge's opinion, the Fifth Circuit in *Bellaire General Hosp. v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822, 826 (5th Cir.,1996), noted that "[t]o say that due process has no place in a personal jurisdiction inquiry seems contrary to the whole concept of due process.". Burnett also respectfully submits that the Magistrate Judge's reliance on *Busch v. Buchman*, 11 F.3d 1255 (5th Cir.1994), is misplaced under the facts of this case, as the service provisions in question are different than in *Bush*. Also, a later panel of the Fifth Circuit expressed "grave misgivings regarding" *Bush*'s authority, and herein Plaintiffs elected not to use the nationwide service provisions of RICO. Moreover, all of the RICO allegations in Plaintiffs' Complaint are mere conclusory statements that totally fail to meet the requirements of Rule 9 of the Federal Rules of Civil Procedure. As such, even if the service provisions of RICO had been utilized, which they were not, RICO could not serve as the basis to justify jurisdiction under its nationwide service procedures where the allegations of mail fraud and wire fraud are so exceedingly deficient.

Burnett likewise objects to and disagrees with the Magistrate Judge's finding that the "ends of justice" were met in this matter, where, contrary to the Magistrate Judge's determination, other than Signal, jurisdiction over most of the remaining defendants would not exist in Texas, but does indeed exist in the Eastern district of Louisiana where all of the Defendants are already subject to that court's jurisdiction in six different suits brought by over 100 plaintiffs and arising out of the same nucleus of operative facts. The Magistrate Judge determined that Michael Pol, a resident of Mississippi, Global Resources, a corporation organized under the laws of Mississippi, J&M Associates of Mississippi, Inc., and J&M Marine & Industrial, L.L.C., organized under the laws of Mississippi, and Billy R. Wilks, a resident of Mississippi, are

subject to personal jurisdiction in Texas because of Plaintiffs' unsupported and conclusory statement that these defendants and Burnett "have substantial business contacts in Texas". There are absolutely no facts pled that establish that any of the defendants beside Signal have sufficient minimal contact with Texas to justify imposition of personal jurisdiction. Conclusory statements of plaintiffs' cannot serve as support for the exercise of personal jurisdiction. Panda Brandywine , supra.

      As to the Magistrate Judge's determination that specific jurisdiction exist over Burnett because of the allegations in Plaintiffs' Complaint, Burnett submits that the Magistrate Judge improperly failed to follow binding Fifth Circuit precedent. Plaintiffs' Complaint failed to allege any tort committed by Burnett in Texas. Plaintiffs have not alleged any damages suffered in Texas that arose out of any of the claimed conduct by Burnett. Rather all of the damages alleged as a result of Burnett's conduct were all incurred while Plaintiffs were residents of and actually located in India. The fact that these Plaintiffs ended up in Texas, of which Burnett had no knowledge or involvement, occurring solely because of Signal's determination, does not equate with Burnett having directed actions toward residents of Texas. Besides, merely causing harm to a resident of a state is not sufficient to establish personal jurisdiction, Stroman Realty, Inc. v. Wercinski, 513 F.3d 476, at 486, which is especially true if the harm was suffered before that person ever became a resident of Texas. Similarly, foreseeable injury in the state is not enough "absent the direction of specific acts toward the forum." Bustos v Lennon, No. 12-50765, ___F3d___ (5th Cir., Aug. 2013), (Unpublished Opinion); McFadin v. Gerber, 587 F.3d 753, 762 (5th Cir. 2009); Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 212 (5th Cir. 1999) .

      Preparing and then mailing from Louisiana forms required by U.S. Immigration procedures, for a client whose principal place of business is in Mississippi, one of which, because of the client's needs went to a Texas agency, and the others going to the United States Department of Labor, and a state agency in Mississippi, at a time when the unidentified non-immigrant workers who eventually end up in Texas had not even been selected by Signal, was

not a specific act directed toward Texas. Rather, it was an act for the benefit of and directed to a client in Mississippi. It was most certainly not directed to any of the Plaintiffs as according to the well pleaded facts of Plaintiffs' Complaint at the time of the mailing to the Texas Workforce Commission, the Mississippi Department of Employment Security and the U.S. Department of Labor, none of the Plaintiffs had even left India or yet been selected by Signal to work at its Texas facility. Likewise, the suggestion that the H-2B visa applications prepared by Burnett were false because Signal's application listed a ten month employment period was allegedly inconsistent with Signal's projected labor needs is a legal conclusion, one that is not supported by the law, which specifically allows for extensions up to three years. Besides, such conclusory statements cannot serve as a basis for imposing personal jurisdiction.

Simply put, there is no reason to "force fit" personal jurisdiction over the Burnett defendants herein, where there is, in reality, only one defendant that has contact with the state of Texas, especially considering that virtually identical actions are pending in six other cases in the Eastern District of Louisiana against all defendants who are already subject to the jurisdiction of that court. Further, virtually all Texas plaintiffs have consented to participating in the FSLA collective action pending in the Eastern District of Louisiana, and the Eastern District of Louisiana was initially chosen to pursue the exact same claims for damages against all defendants when these plaintiffs were putative members of the class action filed in David, et al v. Signal, et al.

Burnett will address each of these objections to the Magistrate Judge's finding of personal jurisdiction in more detail below.

RICO'S NATIONWIDE SERVICE PROVISIONS.

Citing Busch v. Buchman, 11 F.3d 1255 (5th Cir.1994), the Magistrate Judge determined that a federal court obtains personal jurisdiction over a defendant in a suit based upon a federal statute that provides for nationwide service of process when the defendant has had minimum contacts with the United States. However, a subsequent panel of the 5th Circuit in Bellaire

General Hosp. v. Blue Cross Blue Shield of Michigan, 97 F.3d 822 (5th Cir.,1996), strongly disagreed with that decision, although it "dutifully" applied Bush, the statute in question in Bellaire being almost a mirror image of the statute involved in Bush.

> Although we dutifully apply Busch, we emphasize our disagreement with it to the extent it concludes that the proper personal jurisdiction test in a national service of process case is whether minimum contacts exist between the individual and the national sovereign. See Id. We view personal jurisdiction and service of process as conceptually distinct issues. We fail to apprehend how personal jurisdiction can be separated from due process by Congressional enactment of nationwide service of process provisions. See id. at 1259 (Garza, J., dissenting) ("Because the personal jurisdiction requirement is a function of the individual liberty interest, the proper focus for a personal jurisdiction test should be on protecting an individual's liberty interest in avoiding the burdens of litigating in a distant or inconvenient forum. Requiring that the individual defendant in a national service of process case only reside somewhere in the United States does not protect this interest."); see also Willingway Hosp., Inc. v. Blue Cross & Blue Shield of Ohio, 870 F. Supp. 1102, 1106 (S.D.Ga.1994) ("To allow Congress to dictate personal jurisdiction through the enactment of nationwide service of process provisions, unquestioned by the judiciary is nonsensical.... To say that due process has no place in a personal jurisdiction inquiry seems contrary to the whole concept of due process."). It is far from clear to us that Blue Cross, a corporation operating exclusively within the State of Michigan, had sufficient contacts with the State of Texas to permit the district court to exercise personal jurisdiction over it under the traditional personal jurisdiction analysis, i.e., whether the defendant has had minimum contacts with the forum and whether maintenance of the action in the forum will offend traditional notions of fairly and substantial justice. See International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) ("[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.") (citation omitted). Thus, though we follow Busch today and find that the district court properly exercised personal jurisdiction over Blue Cross in this case, we do so with grave misgivings regarding the authority upon which we rely.

Bellaire, supra at 286 Emphasis added.

Burnett submits that the nationwide service provisions of RICO are substantially different than the nationwide service provisions of the federal statutes involved in Bush and Bellaire. 18 U.S.C. § 1965 (b) requires more than just any manner of service of process, which

if followed, may afford a defendant some protection of the "individual's liberty interest in avoiding the burdens of litigating in a distant or inconvenient forum" and at least a modicum of "traditional notions of fair play and substantial justice". However, those provisions were not followed here, and as such, Burnett suggest that the rote application of Bush is inappropriate.

The nationwide service provisions involved in Bush are found in 15 U.S.C. § 78 aa, which provides,

> Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

In Bellaire, the service provision, found in 29 U.S.C. § 1132(e)(2) are nearly identical,

> Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

There are no requirements in either of those two statutes that a plaintiff make any requisite showing to a district court judge that the ends of justice require other parties be brought before the court, and no restrictions of the manner in which service of process may be made. The same cannot be said of 18 U.S.C. § 1965 (b), which provides,

> In any action under section 1964 [the civil RICO remedies] of this chapter in any district court of the United States <u>in which it is shown that the ends of justice</u> require that other parties residing in any other district be brought before the court, the <u>court may cause</u> such parties to be summoned, and process for that purpose may <u>be served in any judicial district of the United States by the marshal thereof</u>. (Emphasis added.)

Burnett submits that this difference is of sufficient substance that a panel of the Fifth Circuit will likely determine that in RICO actions the "grave misgivings regarding the authority" of Bush precludes an automatic imposition of personal liability on any resident or citizen of the United States without affording the individual traditional concepts of due process, fair play and

substantial justice. Burnett submits that "the ends of justice", which surely must include notions of substantial justice and fair play, require much more than simply showing that a resident and citizen of the United States has contact with the United States. By definition, any citizen of the United States will have contact with the United States. It only stands to reason that, as a citizen of the United States, Burnett should be entitled to protection of his "liberty interest in avoiding the burdens of litigating in a distant or inconvenient forum", and that there should be some limits on the sovereign rights of a state over a resident and citizen of another state.

Further, "the ends of justice" should include an analysis of whether the allegations of a complaint on which such personal jurisdiction may be based are mere conclusory statements, devoid of supporting facts. The Magistrate Judge found that such assertions, that is, whether the Complaint has sufficiently pled a cause of action under the Federal Rules of Civil Procedure, has no place in a determination of whether the ends of justice are met. Burnet strongly disagrees. If the nationwide service provisions of RICO are used to obtain personal jurisdiction, then courts should insist that the RICO Complaint meets the requirements of the Federal Rules of Civil Procedure, especially when alleging mail or wire fraud as supporting predicate acts. If the Complaint fails to meet the muster required for alleging fraud, then, Burnett submits, the ends of justice are not met in imposing personal jurisdiction based on such a deficient complaint.

Lastly, issues such as whether there exist a forum where all defendants are present or already subject to the jurisdiction of another court in a case substantial overlap exists, should also figure into the overall equation of whether the "ends of justice" have been met in forcing an individual to defend himself in a distant or inconvenient forum.

Then, and only then, after a showing has been made to the satisfaction of a district court that the ends of justice have been met, process <u>must</u> be served by the United States Marshall of the district in which the service of process is to be made. The directives of a statute such as this cannot to be presumed to be superfluous and simply ignored. The clear words and directives of this statute were inserted by Congress for a reason, and cannot simply be ignored. Plaintiffs

here elected to utilize the provisions of Rule 4 to effectuate service of process, not 18 U.S.C. § 1965 (b).  The Magistrate Judge's Report and Recommendations infers that service herein was made pursuant to the provisions of not 18 U.S.C. § 1965 (b). ("[Fed. R. Civ. P. 4(d)(5)] certainly does not eliminate a party's ability to obtain personal jurisdiction over a defendant through a nationwide service of process provision.") Ftnt 4., Report and Recommendations".  While it is true that the existence of the service option under Rule 4(d)(5) does not eliminate a party's ability to utilize  nationwide service provisions, using Rule 4(d)(5) for service is not equivalent to utilizing the provisions of 18 U.S.C. § 1965 (b).  It is, instead, a completely different manner of service with none of the mandated safeguards of 18 U.S.C. § 1965 (b).

If personal jurisdiction in this matter was to be based on the nationwide service provisions of RICO, the requirements of 18 U.S.C. § 1965 (b) should have been followed by plaintiffs' counsel.  They were not.  Rather, plaintiffs relied on the service provisions of Rule 4 of the Federal Rules of Civil Procedure, which then must satisfy the service requirements under the Texas long-arm statute. This is very close to what the 5th Circuit determined in an unpublished decision, Gonzalez v. Bank of America Ins. Servs. Inc., No. 11-20174, decided December 12, 2011, (5th. Cir., 2011), involving a RICO case. Therein, the Fifth Circuit in a footnote indicated that it did not need to "explore the contours of RICO's jurisdictional procedures" as that particular ground for personal service was not advanced by plaintiffs, and thus performed a traditional jurisdictional analysis.

> Because this ground for personal jurisdiction was waived, we need not explore the contours of RICO's jurisdictional provisions. Instead, we only consider whether jurisdiction is permissible under the traditional contacts analysis. See Cory v. Aztec Steel Building, Inc., 468 F.3d 1226, 1230-33 (10th Cir. 2006) (analyzing traditional contacts analysis after finding RICO does not support jurisdiction); World Wide Minerals, 296 F.3d at 1168-69 (analyzing minimum contacts analysis after finding waiver of jurisdiction under RICO).

Bank of America , supra, at pg 12, ft. 6.

In that plaintiffs elected to serve Burnett through a procedure based on meeting the traditional requirements for the exercise of personal jurisdiction under Texas' long arm statute,

and in doing so elected to not make the requisite showing to a district court prior to process being ordered and service being made by a United States Marshall, the Magistrate Judge's reliance on Bush was misplace. Utilization of Rule 4, which preserves objections to jurisdiction, should not be considered the equivalent of the very specific requirements of 18 U.S.C. § 1965 (b), and should not constitute a basis for exercising personal jurisdiction in this matter.

Alternatively, Burnett submits, that, at the very least, there are controlling issues of law as to the imposition of personal jurisdiction over Burnett based on the nationwide service provisions of RICO in this particular case, which, in the discretion of the Fifth Circuit, should be the subject of an interlocutory appeal.

TRADITIONAL CONTACTS ANALYSIS UNDER TEXAS LONG ARM STATUTE.

Burnett objects to the Magistrate Judge's findings that "the Plaintiffs have clearly satisfied the minimum contact requirement by alleging the Burnett Defendants supplied false information to the Texas Workforce Commission " and "by alleging the Burnett Defendants committed acts outside of Texas that caused tortuous injuries within Texas". A review of both Plaintiffs' Complaint, and the Magistrate Judge's summary of plaintiffs allegations[1] show that under Fifth Circuit precedent, plaintiffs have failed to establish a prima facie case for specific jurisdiction.

Conclusory allegations cannot support a claim of personal jurisdiction.

The court shall accept as true that party's uncontroverted allegations (so long as the allegations are not merely conclusory) and resolve all factual conflicts in favor of the party seeking to invoke the court's jurisdiction. (Emphasis added).
Central Freight Lines Inc. v. Apa Transport Corp., 322 F.3d 376, at 380 (5th Cir., 2003)

---

[1] In the Magistrate Judge's recommendations he summarized the allegations contained in Plaintiffs' Complaint.  Although the Magistrate Judge phrased the allegations as if they were specific to Burnett alone, in fact many of the allegations in Plaintiffs' Complaint referenced only all "defendants" without specifically naming the individual defendants, and the vast majority of the allegations lumped all the defendants together as doing the acts complained of without specifying which particular defendant actually did so.  However, a Complaint should not make general allegations that lump all defendants together; rather, the Complaint must segregate the alleged wrongdoing of one from another.  In re Parkcentral Global Litigation, 884 F.Supp.2d 464, at 470-471.  (N.D. Tex., 2012).

> Without detailed explication of the factual allegations and showing, we will simply state that <u>neither the present conclusory allegations of conspiracy by the California defendants based upon their acts in California, nor the alleged effects of this conspiracy in Texas,</u> show a claim of sufficient minimum contacts with Texas that would support personal jurisdiction of Texas courts against these defendants for their acts in California.

<u>Thomas v. Kadish,</u>748 F. 2d 276, at 282 (5th Cir. 1984). (Emphasis added)

> Moreover, the district court correctly held that the prima-facie-case requirement <u>does not require the court to credit conclusory allegations</u>, even if uncontroverted.

<u>Panda Brandywine Corp</u>, <u>supra</u> at 869. (Emphasis added)

First, the factual allegations of Plaintiffs' Complaint do not establish that Burnett "supplied false information to the Texas Workforce Commission" in the ETA 750 Burnett is alleged to have filed. Rather, paragraphs 113 through 118 merely allege that 1) Signal's projected labor needs would be two to three years, 2) the initial time span listed in the designated place on the ETA 750 was a ten month period, which is the maximum length allowed for an initial H-2B visa and its subsequent extensions, and 3) that Signal attested in the ETA 750 that this was a "peak load, and a one time occurrence".[2]

These statements are not inconsistent and Plaintiffs assertion that they are is a but a legal conclusion of the correctness of the completed ETA 750, as is the assertion in Plaintiffs' Complaint that the information contained therein was false. These are both mere conclusory allegations not supported in law or fact. The H-2B visa regulations contemplate and allow an H-2B visa to be extended for up to three years. Moreover, the ETA 750 is a form required by the U.S. Department of Labor to be sent to the applicable state agency to <u>begin</u> the recruitment process in the United States by advertising locally for the position before an H-2B visa is issued.

---

[2] In fact, the ETA 750 does NOT contain any certification that the need for guestworkers was a "one time, peak load". Rather, it only attest that the employer is able to pay the wages, the job opportunity does not involve unlawful discrimination, the wages offered equal or exceed the prevailing wage and are not based on a commission or bonuses, that job opportunity is not available because of labor disputes, is not contrary to law, and the job opportunity has been and is "clearly open to any qualified U.S. worker". A copy of the particular ETA 750 is attached as an exhibit hereto.

If the positions can be filled locally, then the H-2B visas will not be issued.  The ETA 750 lists the name and address of the employer, the location where the positions are needed, the number of positions, and the dates "You (the employer) Expect to Employ the Alien."

The fact that forms are required to be sent to the Texas Workforce Commission, and were sent on behalf of Signal does not equate with Burnett purposefully availing himself of the protections of the laws of Texas, or that he should foresee the possibility of being haled into a Texas court because of subsequent occurrences with which Burnett had no involvement, and of which he certainly could not have foreseen.  First and foremost, these forms are only to begin an advertisement process to fill the positions in the United States by United States workers.  If the advertisement process in the United States fills the positions locally, the H-2B visas for those positions would not issue.  At the time the forms were sent, at the request of and on behalf of Signal, the H-2B visa applications for unknown workers had not yet been filed and approved.  It is quite a stretch to say that merely sending forms to allow Signal to begin an advertisement process in Texas for United States workers constitutes Burnett having purposefully availed himself of the protection and privileges of Texas laws.  Similarly, there is no way to say that Burnett could have foreseen that all of the positions for which Signal had to advertise in Texas would be approved, that there would not be any local United States workers hired to fill the positions, or that the positions later filled by Indian non-immigrant workers and assigned by Signal to work at its Texas facility would find it necessary to file suit in Texas.

Further, none of those forms could have been directed to any of these Plaintiffs, as they were sent long before any of the Plaintiffs were hired and long before Signal had determined who would work at its Texas facility.  Plaintiffs' Complaint alleges that these forms were sent in "late May or early June, 2006".  (¶ 113).  Yet, the Plaintiffs herein did not arrive in the United States until on or after November 19, 2006.  Plaintiff Mayauru arrived on November 19, 2006 (¶ 21), Plaintiff Meganathan arrived on December 11, 2006 (¶ 18), and Plaintiff, Narayanasamy arrived on November 24, 2007 (¶ 19).  Plaintiffs' Complaint alleges that Ramasay was given the

choice by Signal where to work when he departed for the United States (¶¶ 148, 149). Paragraphs 154 and 155 of Plaintiffs' Complaint establish that upon arrival in the United States Signal representatives met Plaintiffs and separated them into two groups, one group to work in Signal's Texas facility and the other to work in its Mississippi facility. That these particular Plaintiffs ended up in Texas was a purely fortuitous circumstance brought about by Signal, not Burnett.

Simply because a client requested that Burnett file what was necessary so that it could advertise locally, as required by the U.S. Department of Labor, does not establish that Burnett has availed himself of the privileges and protections of the state of Texas. The allegations of the petition show that Burnett was acting as an attorney, in another state, for a client whose directions and instructions came from their main office located in another state. The mere fact that Burnett's client decided which individuals it would send to Texas, sometime after Burnett prepared and mailed off required forms to begin the local advertising requirements for positions, does not show that Burnett either availed himself of the laws and protection of Texas or that he should have anticipated being sued in Texas. If so, then any time an attorney in his or her representation of a nationally based company mails out required forms, that attorney could be simply lumped into a lawsuit against that company anywhere the company may do business. This is not consistent with traditional notions of substantial justice and fair play.

> The "minimum contacts" inquiry is fact intensive and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it "reasonably anticipates be haled into court." <u>The defendant "must not be haled into a jurisdiction solely as a result of `random,' `fortuitous,' or "attenuated' contacts, or of the `unilateral activity of another party or third person</u>.'"

McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009).

Similarly, the fact that Burnett traveled to Signal's facility long after Plaintiffs had allegedly relied to their detriment on Burnett's claimed misrepresentations, is not sufficient to establish the necessary minimal contacts with Texas to justify the imposition of personal jurisdiction. The Fifth Circuit found that even visits to Texas to help further negotiate the

contract was insufficient to confer personal jurisdiction over the defendant.

> The only remaining alleged contact for Zapsib is the 1997 visit of its executive, Mr. Nikiforov, to Texas. The visit, at the invitation of Moncrief, helped to further planning and negotiations, but no agreement was established during the trip. In Hydrokinetics, we found that the defendant's two physical visits to Texas did not create jurisdiction, in part because the defendant did not regularly do business in Texas, and because most of the negotiations appeared elsewhere. 700 F.2d at 1028-29. The same is true here, <u>and Mr. Nikiforov's visit did not create jurisdiction</u>.

Moncrief , supra at 313, emphasis added.

Burnett likewise objects to the Magistrate Judge's determination that minimal contacts with Texas were satisfied under the traditional contact analysis "because the alleged tortuous acts committed by the Burnett Defendants, even if most were committed outside of Texas, caused tortuous injuries within Texas".

The Fifth Circuit has emphasized in several opinions that jurisdiction based on such alleged effects suffered in the forum state are rare, and does not lie simply because an injured plaintiff resides in the forum state, or suffered harm in the forum state.

> "[A]n act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." (Citations omitted). This type of jurisdiction is rare however, and the effects of an alleged intentional tort are merely part of the analysis of minimum contacts. (citation omitted). Merely causing harm to a resident of a state is not sufficient, id., nor is the "fortuity of one party residing in the forum state." (citation omitted). Similarly, foreseeable injury in the state is not enough "absent the direction of specific acts toward the forum."

<u>Bustos v Lennon</u>, No. 12-50765, ___F3d___ (5th Cir., Aug. 2013). Unpublished Opinion.

> "Effects" jurisdiction is premised on the idea that an act done outside a state that has consequences or effects within the forum state can suffice as a basis for personal jurisdiction if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct. <u>Moncrief Oil Int'l Inc. v. OAO Gazprom</u>, 481 F.3d 309, 314 (5th Cir.2007). Such jurisdiction

> is rare. Id. Moreover, as this court has noted, "[T]he key to Calder is that the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum." Allred v. Moore & Peterson, 117 F.3d 278, 286 (5th Cir.1997), cert. denied, 522 U.S. 1048, 118 S.Ct. 691, 139 L.Ed.2d 637 (1998) (emphasis added) (quoting Wallace v. Herron, 778 F.2d 391, 395 (7th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986)). We have declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident.

Stroman Realty, Inc. v. Wercinski, 513 F.3d 476, at 486 (5th Cir., 2008).

In point of fact, none of the "tortuous injuries" alleged by plaintiffs as a result of Burnett's alleged conduct occurred in Texas. The Magistrate Judge summarized the Plaintiffs damages as follows.

> All of the Plaintiffs undertook considerable economic, social, familial, and personal sacrifices to obtain the funds necessary to cover the fees paid to all of the Defendants involved in the recruitment process, including Burnett.

Report and Recommendations, p. 9 of 14.

A close review of the Complaint shows that the injuries allegedly suffered as a direct result of Burnett's alleged conduct were suffered while plaintiffs were still in India, long before any of them decided to accept a position with Signal, and long before Signal choose which workers to employ at its Texas facility. Plaintiffs' Complaint allege the damages suffered from the "inducements" or "representations" by Defendants in paragraphs 2, 62, 70, 81, 90, 272, 279, 280, 289, 290, and 297. Plaintiffs asserted they were "defrauded out of thousands of dollars in recruitment fees under the false promise that they would receive long-term work and permanent residency in the United States" (¶ 2); "undertook considerable economic, social, familial and personal sacrifices to obtain the funds necessary to cover the fees" (¶¶ 62, 70, 81, 90); incurred "exorbitant fees paid by Plaintiffs for green cards, visas, and other immigration and recruitment-related services; interest on debts assumed by Plaintiffs to pay such fees; losses of personal and real property incurred in reliance on Defendants' fraudulent acts; lost and unpaid wages, lost employment opportunities, and other pecuniary losses to real or personal property"

(¶ 272); "sold and pawned personal and real property, took out interest-bearing loans, broke their existing employment contracts, and surrendered other employment opportunities in India (¶¶279,289), "left their homes and jobs in India and Singapore to travel to the United States to work for Defendant Signal(¶¶280, 290), and "paid large sums of money, incurred substantial debts, broke their existing employment contracts, surrendered other employment opportunities, and incurred other financial losses." (¶297 ).

All of these claimed damages, alleged to have been caused by actions or conduct of Burnett, were incurred while Plaintiffs were in India and residents or citizens of India. None of those alleged damages were suffered in Texas or by any resident of Texas. In fact, there are no tortuous injuries alleged to have been suffered in Texas that resulted from any of Burnett's alleged conduct in India. As such, these alleged tortuous injuries were incurred by non-Texas residents, while located outside of the state of Texas, by alleged conduct that also did not occur in the state of Texas. These allegations cannot support a finding of specific jurisdiction in Texas.

The only damages alleged to have been suffered by Plaintiffs while in Texas had nothing to do with Burnett. It was not until those Plaintiffs, whom Signal decided to employ in its Orange, Texas facility, actually arrived in Texas that any alleged damages were suffered in Texas. These types of injuries and damages, such as pay cuts, improper salary withholdings or deductions, illnesses from the living conditions, poor working conditions, and threats are detailed in ¶ 157 through ¶ 187. None of the living or working conditions, illnesses, payroll deductions, or threats alleged therein were attributed by Plaintiffs to Burnett. Accordingly, none of the the damages allegedly suffered by Plaintiffs in Texas were alleged to have been caused by any actions or conduct of Burnett. These allegations cannot support "effects jurisdiction" over Burnett.

The fact that these particular Plaintiffs, after incurring their alleged damages, ended up in Texas does not change the fact that the damages were suffered by non-residents of Texas at

a time when they were in India, and cannot be used to establish that Burnett purposefully availed himself of the protection of Texas laws or directed his alleged activities toward Texas or any resident of Texas. As such, there were no tortuous injuries suffered by plaintiffs in Texas.

Moreover, the allegations of fraud and misrepresentations in Plaintiffs' Complaint were of future conduct, and not misrepresentations of an existing fact. Plaintiffs alleged that "Defendants would assist them in applying for and receiving permanent U.S. residency (commonly referred to as obtaining 'green cards')" (¶ 14); Defendants "induced Plaintiffs to enter into employment agreements by falsely promising to help Plaintiffs obtain green cards." (¶ 54). However, the Fifth Circuit in Moncrief Oil Intern. Inc. v. Oao Gazprom, 481 F.3d 309, at 311 (5th. Cir., 2007), determined that personal jurisdiction did not exist over a non-resident defendant based on allegations of negligent misrepresentations of future conduct allegedly made while the defendant's vice-chairman visited plaintiff in Texas. In that case the plaintiff, Montctief, claimed there was "effects jurisdiction" over defendant, OAO Gazprom, as a result of the misrepresentations made in Texas, as well as in Russia. The Fifth Circuit disagreed.

> The elements of negligent misrepresentation include providing false information upon which a plaintiff relies. Federal Land Bank Ass'n v. Sloane, 825 S.W.2d 439, 442 (Tex.1991). We have further clarified that a negligent misrepresentation claim must allege misstatement of an "existing fact." Accord Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc., 88 F.3d 347, 357 (5th Cir.1996). The misrepresentation alleged by Moncrief concerned the future behavior of Gazprom — that Gazprom would continue to honor the agreements — rather than an existing fact. (Emphasis in opinion) Moncrief also argues that there is "effects jurisdiction" based on the representation made in Texas, as well as a subsequent promise made in Russia. "Effects" jurisdiction is premised on the idea that an act done outside the state that has consequences or effects within the state can suffice as a basis for personal jurisdiction if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct. See Guidry, 188 F.3d at 628. Such jurisdiction is rare. We have expressly declined to allow jurisdiction for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident. See Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d at 870 (5th Cir.2001). Moreover, the alleged promise made in Russia succumbs to the same problem as the one made in Texas: the complaint alleged a misstatement

> of a future event, rather than misstatement of an already existing fact. It therefore fails as a negligent misrepresentation claim, and cannot give rise to jurisdiction as a tort.

Moncrief Oil Intern. Inc. v. Oao Gazprom, 481 F.3d 309 at 314 (5th. Cir., 2007).  Emphasis added.

Further still, there is absolutely no basis in any of the Complaint's allegations against Burnett to support the statement by the Magistrate Judge that "The Burnett Defendants, who allegedly conspired with Signal to lure the Plaintiffs to Orange, Texas with false promises, cannot credibly argue that they could not reasonably have anticipated being sued in this District.".  In fact, there are no allegations of the Complaint that establishes any conspiracy with Signal whatsoever.  Rather, the allegations of the Complaint merely establish that Burnett was working for Signal in preparing the necessary immigration paperwork.

In Berry v. Indianapolis Life Ins. Co., 608 F.Supp.2d 785 (N.D. Tex., 2009), Plaintiffs alleged that four insurance companies,("Insurance Defendants") three consultants companies (Consultant "Defendants"), and a law firm conspired to market plans as a tax shelter with the sale of life insurance policies used to fund the plans.  Plaintiffs asserted that the Complaint alleged multiple facts showing an agreed collaboration among the "Consultant Defendants" and the "Insurance Defendants" to " design and market special insurance policies to fund abusive 412(I) plans".  Plaintiffs also argued that the Complaint, when read as a whole, contained "allegations support[ing] a plausible inference that Defendants had a 'meeting of the minds' regarding this conspiracy to market and sell abusive 412(I) plans."  The district court disagreed.

> However, there are no allegations to suggest that any acts took place in the context of, or as result of, some prior agreement among the Insurance Defendants.
>
> The only remotely specific allegation of an agreement between American General and any other Defendant is the allegation that "Consultant Defendants [. . .] proceeded to work together with the Insurance Defendants to further develop and market this purported 412(I) arrangement . . . ." (Compl. ¶ 71).  This allegation is insufficient to support a conspiracy between American General and Consultant Defendants, as it fails to specify who was involved, precisely what the interaction was or what actions were decided upon, or when any meeting

-17-

> of the minds occurred between those parties or provide factual background to allow an understanding of how "working together" is equivalent to a conspiracy to defraud.

Berry, supra at 795, emphasis added.

Similarly, in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the United States Supreme Court noted that the factual allegations which Plaintiffs claimed supported the assertion of a conspiracy did nothing more than show what would be expected of Defendants in the course of their business.

> We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance.

Twombly, supra at 566, emphasis added.

The same is true herein. None of the facts alleged, and none of the items listed in Plaintiffs' Complaint or Fraud Chart do anything other than show what would be expected of each of these Defendants working together to accomplish the legitimate goals of Signal to obtain temporary non-immigrant workers under H-2B visas. There is no showing that somehow this working together rose to the level of a conspiracy. There is no factual assertions from which one could conclude there was a meeting of the mind to do anything unlawful. In short, there are absolutely no factual allegations of any conspiracy between Signal and Burnett to lure Plaintiffs to Texas with false promises, especially considering that Signal alone determined who would work at its Orange, Texas facility (See Plaintiffs' Complaint ¶ 155), which was decided well after Burnett was alleged to have made any misrepresentations or false statements.

Although there is no need to further examine the Magistrate Judge's finding that exercising jurisdiction comports with notions of fair play and substantial justice, having shown that the Complaint does not establish minimal contacts sufficient to exercise personal jurisdiction over Burnett under traditional contact analysis, Montcrief, supra, at 315, Burnett

submits that the Magistrate Judge was in error in that determination as well. There was no consideration given to the fact that there are a multitude of cases ongoing in the Eastern District of Louisiana making identical allegations against all the same defendants and that under 28 U.S.C. 1404 this matter could be transferred to the Eastern District of Louisiana where there exist not only jurisdiction over Burnett, but also where all defendants in all of the related cases have made appearances and/or over whom personal jurisdiction has been exercised.

Also, the fact that Burnett is but a single attorney, in the face of six other suits pending and proceeding in the Eastern District of Louisiana, brought by over a hundred plaintiffs represented by over thirty counsel of record, with facts and issues that substantially overlap the facts and issues herein, presents a grave inconvenience and difficulty for Burnett to defend against in this jurisdiction.

Burnett submits that when weighing whether or not traditional notions of fair play and substantial justice have been afforded, everything that touches on having to defend the allegations of the Complaint should be considered, including the extent to which the allegations are mere conclusory statements of plaintiffs' counsel, the extent to which the Rules of Civil Procedure have not been followed in alleging fraud, and the extent to which transfer to another forum would afford a more efficient ability to defend against all related cases and minimize re-litigation of issues and the possibility of inconsistent rulings. Looking at all these things leads only to the conclusion that forcing Burnett to litigate in this forum violates traditional notions of fair play and substantial justice.

CONCLUSION

Burnett respectfully request this Court to reject the Report and Recommendations of the Magistrate Judge in denying Burnett's Motion to Dismiss under Rule 12(b)(2), and find that personal jurisdiction over him in this matter has not been established.

Alternatively, should this Court decide not to do so, Burnett requests that this Court indicate in its Order that its opinion and that of the Magistrate Judge involves controlling questions of law as to which there is substantial ground for a difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, so as to allow an interlocutory appeal of this matter be granted in the discretion of the Fifth Circuit.

Respectfully submitted,

s/ Timothy W. Cerniglia

Timothy W. Cerniglia (TX Bar # 00789930)
1521 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone 504-586-0555
Facsimile 504-586-0550
tcerniglia@cernigliaw.pro
Attorneys for the Burnett Defendants

CERTIFICATE OF SERVICE

This is to certify that a copy of this motion has been served electronically on Plaintiffs and the Signal and Dewan Defendants with the Clerk of Court using the Court's CM/ECF system, this 8th day of July, 2014.

s/ Timothy W. Cerniglia