# EXHIBIT B

Summary of Education and Experience

1. I am a University Professor and Director of the Terrorism, Transnational Crime and Corruption Center at the School of Public Policy at George Mason University. I am the author of _Dirty Entanglements: Corruption, Crime and Terrorism_ (Cambridge University Press, 2014); _Human Trafficking: A Global Perspective_ (Cambridge University Press, 2010); the co-editor with Shiro Okubo of _Human Security, Transnational Crime and Human Trafficking_ (Routledge, 2011); and with Sally Stoecker of _Human Traffic and Transnational Crime_ (Rowman and Littlefield, 2005).  My 2010 _Human Trafficking_ book is used as a text at many universities in the United States and Canada including Harvard, University of Toronto, Duke, Georgetown University, Michigan State University, and many more. I am the series editor of the TraCCC book series with Routledge, that has published two books on labor exploitation and trafficking. Recipient of numerous fellowships including the Guggenheim, two Fulbright awards, NEH (National Endowment for the Humanities) fellowship, I have written numerous newspaper and magazine articles on human trafficking and transnational crime. My particular focus has been the business of human trafficking, and the role of organized crime in this activity, from a global perspective.

2. I hold a BA from Cornell University and an MA in Criminology and a PhD in Sociology from the University of Pennsylvania, earned in 1977. I have had a Fulbright fellowship for study in Russia for my doctoral dissertation, and taught under a Fulbright in Oaxaca, Mexico, a major source region for smuggled and trafficked labor into the United States.

3. I have studied and worked to address all forms of human trafficking since the early 1990s. To understand the problem, I have travelled extensively in the United States and abroad, visiting many of the places where the Signal workers have been employed before coming to Signal, including Abu Dhabi, Azerbaijan, Dubai, Russia and Singapore.  I have seen some of the work conditions, the absence of safety, overcrowded housing and talked to specialists on migration and officials of the International Organization for Migration (IOM) on the conditions in these locales. I have worked for the adoption of the US anti-trafficking law, having testified before the US Congress on several occasions on human trafficking, and testified in the State of Virginia, the state of my employment, in order to achieve passage of a state law on human trafficking. I have taught human trafficking, first in the context of transnational crime, and now I teach a dedicated class in the George Mason University curriculum on human trafficking. I have inspired many students to work in this field. I lecture widely at universities, public fora, and at training programs for law enforcement on the issue of human trafficking. TraCCC, the research center that I direct, has hosted many public events on human trafficking that have brought together government officials from many agencies, community members and NGOs. I have appeared on radio and television, and my presentations on human trafficking are widely available. I presently chair the human trafficking group of the Organization of Economic Cooperation and Development (OECD) which has representatives from ILO (International Labour Organization), UNODC (United Nations Office on Drugs and Crime), OSCE (Organization For Security and Co-operation in Europe) and I co-chair the working group against Human Trafficking of the World Economic Forum (WEF) that

2

works with the business community and NGOs. The highlights of my anti-trafficking

work in the last five years are presented in an attached list separate from my resume.

4.  I have served as an expert witness in many asylum cases in the last twenty years.  I

have also served as an expert witness in complex litigation cases. I have done much work

with law enforcement to help prepare training materials on how to combat human

trafficking. I have worked with Ruchira Gupta in 2004, one of the leading anti-human

trafficking activists in India, on developing a roadmap for the USAID (US agency for

International Development) on combating human trafficking in India and other regions of

Asia.[1] I have interviewed Kailash Satyarthi at the World Economic Forum, a leading

human rights figure in India, who has led marches against child labor trafficking.[2]

5.  I base my opinions in this statement on my understanding of human trafficking,

gathered from years of experience of interviewing individuals, and reading case files of

successfully prosecuted human trafficking cases. I have worked with members of the

business community and NGOs trying to address labor trafficking. I have a comparative

perspective on this issue, knowing both the Trafficking Victims Protection Act of 2000,

the Trafficking Victims Protections Reauthorization Acts, and the work of the United

Nations Office of Drugs and Crime, and the Organization and Security and Cooperation

in Europe, of which the US is an active member, on the issue of labor and sexual

trafficking.

---

[1] Ruchira Gupta, Lisa Kurbiel, Louise Shelley, Jill Tirnauer, "Trafficking in the ANE Region: Problem Analysis and Proposed Framework for USAID Reponse," June 2014, http://pdf.usaid.gov/pdf_docs/PNADC972.pdf.
[2] For mention of his work, see http://www.oxotower.co.uk/events/talk-human-rights-defender-kailash-satyarthi/.

6. The materials which I considered in formulating my opinions are included as an attachment to this report (see Appendix I). They include legal filings concerning the case from both the plaintiffs and Signal, financial and safety records of Signal, thousands of emails of Signal staff and an extensive literature review and reports on human trafficking both in the US, India and other countries, where Signal's H2B workers were employed previously.  I have examined conclusions of the US government of previous investigations of Signal.  I have visited New Orleans and met and ate at the restaurant of the food caterer, discussed his food menus and preparation, and tasted common items served to the Indian H-2B workers.  I visited Pascagoula, Mississippi and interviewed top staff of Signal Corporation, including individuals who went to India to test employees.  I have also interviewed two current Signal employees who arrived at Signal as H-2B workers.  While in Pascagoula, I visited the shipyard and also the man camps where the workers were housed. I saw the residential facilities, including the mess hall and the fences and security controls of the facility.  I saw some of the trailers that were transported from Orange, Texas to Pascagoula, Mississippi. I have seen a video of the man camp in Texas filmed in 2008.

**Analysis of Human Trafficking**

7. The eighth chapter of my book, *Human Trafficking: A Global Perspective* discusses the United States. My analysis there of labor trafficking in the US has been very much shaped by the reports of individuals and organizations active in this case. I cite their research in discussing labor trafficking in the South, and human trafficking post-Katrina.

On p.233 of my book, I cite the first edition of a report from the Southern Poverty Law Center entitled, "Close to Slavery: Guestworker Programs in the United States." [3] According to the Southern Poverty Law Center Report's 2007 version, human trafficking of guest farm workers who enter on H-2 visas occurs when they are "held virtually captive by employers or labor brokers who seize their documents; forced to live in squalid conditions; and denied benefits for on-the-job medical injuries."[4] These are important criteria by which I and many others doing official assessments recognize human trafficking. In the Signal case, no one has held captive, no documents were seized, and, in contrast to what might be expected in trafficking cases, both health insurance and medical care were provided to workers employed in what has been demonstrated to be one of the safest shipyards in the United States. (See Apprendix II.) This **safety record is the key indicator** because only individuals who can sleep, eat properly, and have sufficient rest periods can function to maintain an accident rate that is a small fraction of the industry standard.


8. Trafficking is a legally defined concept and is not subject to shifting definitions to suit the occasion. Authoritative definitions are those provided by the UN and the TVPA. The definition of labor trafficking was established under the Trafficking Victims Protection Act, first adopted into law by the US Congress in 2000 and subsequently reauthorized in 2003, 2005, 2008 and 2011. It provides criteria by which to determine labor trafficking

---

[3] Louise I. Shelley, *Human Trafficking: A Global Perspective* (New York and Cambridge, 2010), p, 233.
[4] Southern Poverty Law Center, "Close to Slavery: Guestworker Programs in the United States." http://www.ncfan.org/storage/Close%20to%20Slavery.pdf, 2. This is the 2007 version.

and defines labor trafficking as: "The recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."[5] The United Nations defines human trafficking under Article 3, paragraph (a) of the Protocol to Prevent, Suppress and Punish Trafficking in Persons. According to the UN Protocol, of which the US is a signatory nation, Trafficking in Persons is defined

> as the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs.[6]

9. In 2013, The Southern Poverty Law Center reissued a revised version of their earlier report, "Close to Slavery: Guestworker Programs in the United States." and included significant material on the Signal case.[7] This updated report is not consistent with their earlier report on human trafficking but alters the criteria defining human trafficking, providing analyses that are consistent neither with the Trafficking Victims Protection Act (TVPA) legislation nor the UN legislation or with the facts of the Signal case. On p.16 of the Southern Poverty Law Center's 2013 version, the report states, "Joey's first child was born shortly after he arrived in the United States. He was unable to travel home to see his new born daughter, but the desire to take care of her fueled him to keep fighting through

---

[5] See https://www.bja.gov/ProgramDetails.aspx?Program_ID=51; provision 8 severe forms of trafficking.
[6] See http://www.unodc.org/unodc/en/human-trafficking/what-is-human-trafficking.html.
[7] "Close to Slavery: Guestworker Programs in the United States. 2013 edition," http://www.splcenter.org/sites/default/files/downloads/publication/SPLC-Close-to-Slavery-2013.pdf, 10-11, 15-16, 32-3, 35-36, 46-7.

the indignities and hardships too common in the guest worker program."[8] Many Signal

workers returned home to India during their employment, according to examined records,

and others took extended leave of absences for familial reasons. During the greatest

recession the United States has known since the 1930s, many American workers could

not afford to take time off or pay for transport to visit family members. This is not a

criterion of human trafficking according to either the UN definition or TVPA, but rather

it is a new criterion added by SPLC to attack Signal.


10. In my book, *Human Trafficking:A Global Perspective*,  in discussing labor trafficking

I also used the report "And Injustice for All: Workers' Lives in the Reconstruction of

New Orleans."[9]  This study was authored by Judith Browne-Davis, Jennifer Lai of the

Advancement Project, Marielena Hincapie of the National Immigration Law Center and

Saket Soni of the New Orleans Worker Justice Coalition/Advancement Project. Mr. Saket

Soni has been deeply involved in this case against Signal.[10] As I quote this report on

p.253 of my book, post- Katrina construction workers residing in New Orleans lived "in

an unprecedented level of exploitation, …without any guarantee of a fair day's pay or

any pay at all."[11]Another part of the report is cited in which "one group of Asian

reconstruction workers was "held captive by contractors in a mid-city hotel."[12] These

situations described in the report and cited in my book shaped my understanding of the

---

[8] Ibid, p.16.
[9]  Judith Browne-Davis, Jennifer Lai, Marielena Hincapie, and Saket Soni, "And Injustice
for All: Workers' Lives in the Reconstruction of New Orleans," July 1, 2006,
www.nilc.org/document.html?id=19.
[10] Julia Preston, "Suit Points to Guest Worker Flaws,"  February 1, 2010.
http://www.nytimes.com/2010/02/02/us/02immig.html?_r=0
[11]  Shelley, p.253 citing p.8 of note 9.
[12] Ibid.  citing p.47 of  note 9.

problem of labor trafficking in the South and are all fully consistent with the TVPA legislation.

11. In contrast, the conditions in the Signal case are completely different from these examples, and once again, as in the case with the Southern Poverty Law Center, Mr. Saket Soni's statements against Signal reflect differing and shifting criteria for trafficking that are inconsistent with his earlier description of trafficking, and with American law as well. Signal did not obtain workers for its facilities in Texas and Mississippi through the use of force, fraud or coercion.  The workers who came to Signal were recruited by Sachin Dewan and worked with the recruiter Michael Pol and the lawyer, Malvern C. Burnett, none of whom were Signal employees.  None of the workers allege that force was used to recruit them to the United States. In the Signal case, the qualified workers were paid $18 an hour, with 50 percent overtime. Their pay was deposited directly into their bank accounts so that it was available for immediate withdrawal. As will be discussed later, the workers were not confined and enjoyed access to the outside world.

12.  The recruiting activities of Dewan, Pol and Burnett began several years before there was any contact with Signal International. If there was fraud committed by these three, as alleged in the complaints, this began in late 2003 in the pre-Katrina environment[13] and was not known to Signal when they signed the contract with the recruiters Global Resources, when Signal's testers travelled to India, or before the arrival of the workers. Signal was deceived as well as the workers, as they were told that recruitment fees were $2,000 to 3,000 while the workers were charged a multiple of this.

---

[13]  Third Amended Complaint, Exhibit 1, Specific Fraud Allegations Related to Named Plaintiffs ("RICO Fraud Chart"), filed 9/21/12, p.1 of 102.

13. The workers were not exposed to "involuntary servitude, peonage, debt bondage, or slavery" while working at Signal. The workers were hired as direct employees of Signal and received the same wages as other employees of Signal for similar labor. In many cases, as Signal employees, they worked in conditions that were superior to those of American workers at similar shipyards that do not have the exemplary safety record of Signal.

As Judge Zainey has written in his statement denying class certification,

> In other words, some "choices" might be so illegitimate that any decision
> to work is "involuntary." See Kozminski, 487 U.S. at 959
> (Brennan, J., concurring). But this case does not present one of
> those situations. To the contrary, this case involves paid
> workers who in fact could leave their jobs at any time, albeit
> under penalty of returning to their home countries but that
> restriction was dictated by U.S. immigration law. The workers
> were for the most part paid well, free to come and go as they
> pleased, and some even took vacations and bought cars. The
> pressure to work for Signal arguably came at least in part from a
> set of circumstances that each plaintiff individually brought
> upon himself when he elected to pay what is now characterized as
> "exorbitant" fees to participate in the green card program. Part
> of the "serious harm" that Plaintiffs claim that they faced was
> financial and reputational harm which are uniquely individual in
> nature. And the "threats" that Plaintiffs allege were made to
> compel them to work were often made to individuals, not to the
> class as a whole.[14]

14. The complaints have alleged that the workers were required to work in order to pay off the debts that they incurred to the recruiter. Even if these debts exist in India to friends, family and banks, they do not fit the definition of debt bondage that is cited either in the TVPA legislation or in the UN legislation.

---

[14] Opinion of Judge  Jay C. Zainey, in Kurian David et. al. vs. Signal International, denying class certification,  United States District Court, State of Louisiana, July 3, 2012,pp. 58-59.

9

15. Article 1(a) of the 1956 United Nations Supplementary Convention on the Abolition of Slavery defines debt bondage as "the status or condition arising from a pledge by a debtor of his personal services or of those of a person under his control as security for a debt, if the value of those services as reasonably assessed is not applied towards the liquidation of the debt or the length and nature of those services are not respectively limited and defined".[15]

TVPA 2000 law on debt bondage is as follows: The term 'debt bondage' means the status or condition of a debtor arising from a pledge by the debtor of his or her personal services or of those of a person under his or her control as a security for debt, if the value of those services as reasonably assessed is not applied toward the liquidation of the debt or the length and nature of those services are not respectively limited and defined.[16]

The Indian H-2B workers did not offer their labor for repayment of a debt. Therefore, there was no debt bondage in this case under either the American or UN definitions.

16. The element of coercion under the TVPA definition is also not present as evidenced by the finding of the Department of Justice. The TVPA's definition of coercion is:

(A) threats of serious harm to or physical restraint against any person;

(B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

(C) the abuse or threatened abuse of the legal process.

---

[15] http://www1.umn.edu/humanrts/instree/f3scas.htm Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, 226 U.N.T.S. 3, entered into force April 30, 1957.
[16] Victims of Trafficking and Violence Protection Act, 2000, October 28, 2000, http://www.state.gov/j/tip/laws/61124.htm.

Signal has been cleared of alleged violations of 8 U.S.C. § 1324b (Unfair immigration-related employment practices) by the Office of Special Counsel, Unfair Immigrated-related practices of the Civil Rights Division of the Department of Justice on March 14, 2008.[17] Provision 5 of 8 U.S. Code § 1324b states: (5) **Prohibition of intimidation or retaliation**

"It is also an unfair immigration-related employment practice for a person or other entity to intimidate, threaten, coerce, or retaliate against any individual for the purpose of interfering with any right or privilege secured under this section or because the individual intends to file or has filed a charge or a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section. An individual so intimidated, threatened, coerced, or retaliated against shall be considered, for purposes of subsections (d) and (g) of this section, to have been discriminated against."[18]

17.    Signal did not threaten its workers with physical harm or restraint. Rather, as will be discussed subsequently it worked hard to provide its workers a safe environment in a dangerous industry. People were not coerced to perform an act, especially if they were not qualified to do this.[19] There are strong indications that some individuals engaged in fraud in India by having other persons take the skills test for them as indicated by the fact that the Signal skills tester did not recognize them on their arrival in the US, and their

---

[17] letter from Patrick Shen, Deputy Special Counsel, Office of Special Counsel, Unfair Immigrated-related practices of the Civil Rights Division of the Department of Justice on March 14, 2008.

[18] http://www.law.cornell.edu/uscode/text/8/1324b.

[19] Judge Zainey's opinion on. p.33 refers to the fact that after the initial workers arrived, others who less qualified came as the recruiter gave preference to those paying higher recruiting fees.

failure to be able to perform the needed skills. But despite the arrival of unqualified workers, Signal did not coerce any workers to perform functions that they were not equipped to do.  Nor did Signal abuse or threaten to abuse the legal process.

18. The Signal situation differs significantly from the situation just previously described and the conditions identified both by Southern Poverty Law Center and the Advancement Project report which Saket Soni co-authored on human trafficking in New Orleans.

19. Moreover, the Signal situation differs from the US definition of human trafficking, as defined by the Trafficking Victims Protection Act, the prevailing federal law.

20. Independent government investigations by the Texas government and researchers of the Department of Justice determined the Signal case did not involve trafficking.   The Bureau of Justice Statistics 2011 report on "Characteristics of Human Trafficking, 2008-2011," analyzes individual trafficking case data from throughout the United States to provide its conclusions. This federal government report, by providing data on different categories of victims, clearly excludes the numerous plaintiffs of the Signal case in their categorization of human trafficking. The Bureau of the Justice Statistics, the in-house statistical research arm of the U.S. Justice Department, relied on data provided by human trafficking task forces throughout the country.[20] The Texas Task force on human trafficking, according to their report to the 2009 Texas state legislature, started supplying data to the federal authorities on January 2008, before the Signal case was filed. The Task Force report reveals that they actively pursued trafficking cases in Beaumont, Texas close

---

[20] Duren Banks and Tracey Kyckelhahn, "Characteristics of Suspected Human Trafficking Incidents, 2008-2010, Bureau of Justice Statistics, April 2011, p. 6, table 5,  http://www.bjs.gov/content/pub/pdf/cshti0810.pdf.

to Orange, Texas where the Signal workers were employed.[21] Therefore, the Texas State

Task Force Report reveals that law enforcement authorities were working on trafficking

in the region of Orange, Texas and both the Texas Task Force and the Bureau of Justice

Statistics determined that the Signal case was not trafficking, as it is not included either in

the Texas State trafficking report or in the BJS Report.

21.     Data in Table 5 of the Bureau of Justice Statistics Report shows that in the entire

United States during this period, there were only 9 Asians identified nationally as victims

of labor trafficking, and only 2 victims who were temporary workers, the classification

for H2B visas. (See Table 5, Appendix III.) Because many more than two individuals at

the Orange, Texas facility asserted that they were victims of human trafficking, it is clear

that the state and federal authorities, after examination of the Signal case, excluded this

data from their national assessment of labor trafficking.

22 . I will now turn to the expert witness report of Florence Burke.  Her analysis of the

situation of Indian overseas workers does not reflect the contemporary reality of the

Indian economy nor an in-depth understanding of the situation that Indian migrant

workers face when they travel to other parts of the world.

Ms. Burke wrote on p. 21 "The decision to leave family members at home is not an easy

one, but Plaintiffs came to the United States prepared to work hard, do well and make a

better life for themselves and their families." Most of the workers had been guest workers

---

[21] Office of the Attorney General, The Texas Response to Human Trafficking,  Report to
the 81st Legislature, 2009,  p.11,
https://www.texasattorneygeneral.gov/AG_Publications/pdfs/human_trafficking_2008.pd
f. Note that detectives in Beaumont were working on a sex trafficking case, p.20.

13

previously, 19% of them were already living in Dubai. The majority of workers at Signal

were from Kerala, which has three million working overseas, and leads the country in the

amount of foreign remittances sent home.[22] The decision to go abroad is not an easy one

but is presently a condition of millions of migrant workers in the world, and is not to be

equated with the legal definition of trafficking or the conditions of trafficking that Ms.

Burke describes. It is, unfortunately a reality of life and especially in India, that is now

the largest recipient of remittances in the world from Indians who go overseas to work.[23]

The salaries that Indian workers make in the Persian Gulf are much less than in the US,

and the hours they work are much longer in less safe conditions.  A recently released

report from Amnesty International discussed the plight of 500,000 Keralites working in

Saudi Arabia, "Many workers complained that they were forced to work 15 to 18 hours a

day without a day off. The majority of them do not get their salaries, and some of them

were not paid for several months by their employers in Saudi Arabia." [24] There, as

elsewhere in the Gulf, region they reside in sub-standard housing and lack medical

insurance.[25] In the absence of Indian oversight of labor recruiters, many Indians incurred

significant debts to work overseas that they could never pay off.

---

[22] "Migrant Workers Changing the Face of Kerala," February 28, 2013,
http://www.ucanindia.in/news/migrant-workers-changing-the-face-of-kerala/20406/daily.
[23] India, according to the latest World Bank data is the largest recipient of  remittances,
http://siteresources.worldbank.org/INTPROSPECTS/Resources/334934-
1199807908806/Top10.pdf.
[24] "Indian migrant workers from Kerala face chronic rights abuses abroad Amnesty
International India report cites physical abuse and deception by agents recruiting for jobs
in Saudi Arabia," July 4, 2014
 http://www.ucanews.com/news/indian-migrant-workers-from-kerala-face-chronic-rights-
abuses-abroad/71343.
[25] David Batty, "Conditions for Abu Dhabi's migrant workers 'shame the west'",
December 21, 2013, http://www.theguardian.com/world/2013/dec/22/abu-dhabi-migrant-

14

23. Ms. Burke on p.11 identifies the following features of human trafficking:

a)  High recruitment fees and deceptive practices that induce the individuals to incur significant debt or sell major assets;

b) Confusion, lack of time, absence of interpreters at the time of recruitment and other recruitment circumstances which make it difficult for recruited individuals to ask questions and ensure they understand documents they are signing

c) Immigration status that depends on the employer, and employer and recruiter promises and/or threats regarding immigration status

d) Misleading or deceptive statements

e) Employer provided, substandard room and board

f) High employer deductions from wages

g) Different work duties and responsibilities than described during the recruitment stage

h) Different wages than described during the recruitment stage

i) Surveillance

j) Geographic Isolation

k) Discriminatory treatment, especially based on race and/or national origin, including comments/harassment, segregated housing, and other verbal and non-verbal assaults on personal dignity

Responses to the points above:

---

workers-conditions-shame-west; Lisa Allen, "Dark side of the Dubai dream," April 6, 2009, http://news.bbc.co.uk/2/hi/uk_news/magazine/7985361.stm.

24. Point a)  **Recruitment practices** response to pp. 13 and 14, paragraph 31

The recruiter in India and his partners Michael Pol, Global Resources, and Malvern C.

Burnett might have engaged in deceptive promises, but as the chronology presented by

the plaintiffs in the third amended complaint,[26] Signal was not part of any deceptive

promises. The presence of Signal personnel in India was merely to test the skills of future

employees. As Ms. Burke says, "The promise by Signal of applying for green cards for

Plaintiffs was uppermost in the workers' mind."  Signal did not promise the workers

green cards, and did not learn that this promise had been made by the recruiters until after

the workers arrived at Signal facilities. Burke continues "It became clear that Signal had

no intention of attempting to obtain green cards for Plaintiffs." H2B visas do not convert

into green cards and therefore, legally, Signal could not seek to obtain green cards for

H2B workers.


25. Point b) **Confusion, lack of time,**  response to p.14, paragraph 32

The majority of the analysis in para. 32 refers to Sachin Dewa and his recruitment

practices and does not address the points concerning confusion. The expert opinion

refers to Sachin Dewan and his associates in the United States as Signal's lawyers. There

is no mention of the presence of these recruitment practices in 2004 by Dewan, Pol and

Burnett**,** well before Signal was involved. Judge Zainey's opinion in denying class

certification refers to this activity of the other defendants as Phase I that laid the

groundwork for the developments that followed.  Many of the H2B workers who came to

---

[26] Third Amended Complaint, Exhibit 1, Specific Fraud Allegations Related to
Named Plaintiffs ("RICO Fraud Chart"), filed 9/21/12.

Signal were recruited by Dewan Consultants for work in other locales and paid their

recruitment fees to Dewan and his American associates before 2006 when Signal was

offered Indian workers by the American associates of Dewan.


26. Point c) **Employer Control and Promise Regarding Immigration Status**, para. 33

The analysis provided in this point is different from the features of trafficking outlined on

p. 13. in point c, in which the issue of  the immigration status depends on the employer

and employer and recruiter promises. I will discuss this typical characteristic of

trafficking in reference to this case as the expert witness statement of Ms. Burke does not.

The H2B program, which the workers entered on, does not provide for immigration and

the plaintiffs went to their interviews at the embassy stating that they were applying for

short-term employment. Therefore, there was no promise from the US government or

Signal that they would get immigration status through this employment. The discussion

in paragraph 33 about the promised green card is relevant to questions of deception but

not to the attribute of trafficking that is raised in point c.


27. Point d)  **Misleading or Deceptive Statements** response p.15 para 34


There might have been misleading or deceptive statement from the recruiter but not from

Signal. Signal interviewed for welders and pipe fitters, provided employment, met pay

criteria and employment benefits in the contract, as well as the stipulation for deduction

for housing and food. Signal did apply for Green Cards for all the H2B workers

17

employed there at the end of the program, although they had to return home, under the
conditions of US law, in order to receive them.

28. Point e) **Employer-provided substandard room and board** p. 16 (points 35 and 36)

"The H-2B working visa is a nonimmigrant visa which allows foreign nationals to enter
into the U.S. temporarily and engage in nonagricultural employment which is seasonal,
intermittent, a peak load need, or a one-time occurrence." [27]

The ability to arrange for a large number of H-2B visas was a consequence of the vast
devastation post-Hurricane Katrina in which so much of the Gulf region housing was
destroyed or made inaccessible.  Therefore, Americans in the region did not have good
housing and the temporary housing that was accessible only to American citizens through
FEMA had serious problems and was sub-standard.[28]

The competition for housing in this region with so much destroyed housing was fierce.
The workers, without provision of housing, could not compete for housing in the regional
market as they did not have a credit history, had a nine month visa as H2B workers and
could not sign a year long lease. They were not competitive renters in a limited housing
market. Not having vehicles or driver's licenses that would allow them to drive, without
the provision of housing close to work they could not be sure of getting to work at needed
hours.

In contrast, Signal tried to buy better quality trailers for housing that exceeded the quality
used by other employers in the area. I have had a chance to see the trailers that were used

---

[27] Website of U.S. Citizen and Immigration Service on H-2B visas,
http://www.uscis.gov/working-united-states/temporary-workers/h-2b-non-agricultural-
workers/h-2b-temporary-non-agricultural-workers.

[28] Bruce Watson, The Horrible Odyssey of Fema's Hurricane Katrina Trailers," August
28, 2010, http://www.dailyfinance.com/2010/08/28/the-awful-odyssey-of-femas-
hurricane-katrina-trailers/.

in Texas and are now located in Pascagoula, Mississippi and to watch a video that was made before the facilities were closed. These comments are informed by this direct observation.

Signal rejected the use of temporary facilities that were used by other companies as being inferior and inadequate for the workers at Signal. They went for higher-end trailers than were used by other companies to house their guest workers and bought the modular units from GE. When Dick Marler, the CEO, saw the occupancy density when the camps were first set up, he ordered more trailers to reduce crowding.

Signal was exempt from OSHA standards for the housing of its H2B workers but, nonetheless, tried to comply because it wanted to meet an established standard. This housing was cleaned by a cleaning crew daily.

The food was provided by a caterer who runs a well-rated restaurant in New Orleans. I was able to eat some of the dishes that were served and to discuss with the caterer the challenges of serving food to Indians from many different regions and ethnic groups. There were both Muslims and Hindus in the work camps, meaning that pork and beef could not be used. Requests from workers for goat and lamb, expensive and not easy to obtain items in the region, led to their addition to the menus a few times a month to provide more variety. With workers from North and South India with distinctly different cuisines, a compromise in the spiciness of the food was sought. As one Indian worker at Signal explained, he did not like the food because it was not as spicy as he was used to. But the food was adequate in quantity and was nutritional, with fresh fruit and needed food groups represented, according to the menus.

19

29. Point  f  **High employer deductions from wages**  (point 37)

The deduction of  $1050 a month from Signal employees **was not** a source of profit for the company, rather, they did not even recoup the costs of the investment that Signal had made, an investment of $4.7 million to acquire the man camps. $15 a day for catered food in unlimited quantity is not excessive, nor is $20 daily for housing in an area in which there is not available housing, and there is an environment of scarcity. The average American pays 34% of their gross salary for housing and 13% for food and a minimum of 10% for transport.[29] If the wage earned is $18 an hour, then the housing and food price is approximately $260 a week out of a weekly paycheck of $720  (with no overtime) or 36% of their paycheck going for housing, food, transport, internet service and cable tv. This is well below the budget percentage that Americans would be paying out of their income for these goods and services, which would total 59% of their income. Housing prices for non-citizens were necessarily higher, as the Indians were non-citizens and were not eligible for FEMA housing, nor could not obtain housing on the competitive market for limited existing housing supply post-Katrina without a credit history in the United States. With only a nine month visa, Indian workers did not have the possibility to sign a rental agreement for one year.

30.      Point G not addressed by Ms. Burke **Different Work Duties and Responsibilities than Described during the Recruitment Stage**

The workers at Signal performed the jobs that they were recruited for, and performed these tasks if they had the skill sets required. As was previously mentioned, some of the workers were not recognized by the testers on their arrival at Signal and were

---

[29] http://budgeting.thenest.com/typical-percentages-household-budgets-3299.html.

subsequently found to lack the needed skill sets. This suggests that some of the H2B

workers hired someone to take the tests for them. They could not perform the job

contracted for, and so Signal chose to set up training for these H2B workers, at

considerable cost to the company, to provide them with useful work skills.

31. Point H not addressed by Ms. Burke **Different wages than described during the**

**recruitment stage**

The only workers who received less than the promised wage were those who were unable

to perform the expected work at the needed quality level. Based on my analysis of salary

levels supplied by Signal, this represented approximately 8.5 percent of the work force.

As mentioned in the previous point, training was provided to workers, and some of them

managed after training to get better-paid positions commensurate with their new skill

level after training, but they did not get the wages of workers with long-term experience.

Signal made an effort to accommodate all the workers who arrived and provide them

employment even when they did not have the skills needed by the company.

32. Point I **Surveillance** (response to para. 38)

Signal facilities maintain security services as workers are working on expensive rig

equipment that needs to be protected. There is security at Signal for all employees, and

not just for H2B workers.  Burke comments "Signal was watching them and could report

to law enforcement officials if they left Signal for good." Signal not only could but was

required under American law to report if the workers had left their employ, as the H2B

workers were no longer in compliance with the terms of their visa.

33. Point H **Geographic Isolation**  (Para. 39)

21

Ms. Burke writes, "The Texas camps were located in an East Texas town with limited
community resources for recent arrivals from India." Orange, Texas, the most Eastern
town in Texas has under 20,000 inhabitants and has limited resources for everyone. This
was especially true after Hurricane Rita struck Orange, Texas in September 2005,
devastating the region.[30] In most labor trafficking cases where there is a concern about
geographic isolation, there are problems on remote farms and forest sites, where workers
cannot have access to the outside world. The workers in East Texas were accommodated
close to their work, which is the standard practice in the oil rig industry. East Texas is not
Dubai where there are hundreds of thousands of guest workers from India and many
services catering to Indians. The residence of the workers was not an intentional decision
to isolate the workers, but rather a consequence of the locality where they would work
and the absence of much needed infrastructure post-Rita.[31]

34. Point I **Discriminatory treatment, especially based on race and/or national origin**
(para. 40)

As previously mentioned, Signal was cleared of alleged violations of 8 U.S.C. § 1324b
(Unfair immigration-related employment practices) by the Office of Special Counsel,
Unfair Immigrated-related practices of the Civil Rights Division of the Department of
Justice on March 14, 2008.

---

[30] http://www.beaumontenterprise.com/photos/article/Hurricane-Rita-Eight-years-ago-today-4836744.php
[31] Jennifer Turnham, Jonathan Spader, Jill Khadduri and Meryl Finkel, "Housing Recovery on the Gulf Coast Phase I: Results of Windshield Observations In Louisiana, Mississippi, and Texas," December 2010, http://www.huduser.org/Publications/pdf/Housing_Recovery_in_the_Gulf_Coast_PhaseI _v2.pdf.

Signal made a significant effort to ensure good relations between the American and Indian workers. The American workers were informed by letter at the time of the Indian workers' arrival of the need for workers and the expectation that they would treat them with respect, the H2B workers worked on the rigs in mixed crews with American and contract wage employees.

They were included in the Family Day for Signal employees, cricket equipment was bought at significant expense so they could play a game central to their culture, and they even won raffle prizes such as televisions at Family Day.

35. There are many attributes of labor trafficking that are not included in the list prepared by Ms. Burke.

The following criteria are not included in Ms. Burke's list and have been identified as central to labor trafficking. Kevin Bales' refers to people who labor under the most exploitative conditions as "disposable people."[32] They suffer from the following as a result of labor trafficking: 1) they become emaciated, 2) work in dangerous work conditions, 3) have high rates of accidents, 4) absence of attention to their health needs.

36. **Weight:** The Signal employees did not become emaciated even though they complained about the food. Photographs of the employees show that many gained weight between the time they arrived and the photographs that were taken on family day.

37. **Dangerous Work Conditions**: The shipbuilding industry is inherently dangerous, but Signal has one of the best, if not the best, safety record in the shipping industry. (see Appendix II)

---

[32] Kevin Bales, Disposable People: New Slavery in the Global Economy (Berkeley and Los Angeles: University of California Press, 1999).

23

38. **Rate of Accidents:** Examining Slides 1, 2 and 3 on Signal's safety performance reveals that it has an extremely low rate of accidents. Examining the data for the years, 2006 to 2008 when the Indian H2B workers were present, there was no increase in accidents, rather the low rate of accidents was maintained. Considering that many of the Signal employees had limited English, the company went to extraordinary lengths to retain its safety record. Signs were translated and posted in Hindi and efforts were made to ensure the continuation of established safety practices. During the time the Indian workers were present, Signal International had an OSHA accident rate of .6 in 2007 and .67 in 2008 when the industry average is about 6.8 In other words, Signal had one-tenth the accident rate of its competitors.  Signal received the Excellence in Safety Award in 2009 for the sixth time in recognition of its superior performance relative to the other 43 companies and 100 shipyards that are operational in the United States.[33]

39. **Safety Issues:** Many Signal Indian H2B employees received hourly bonuses for their adherence to safety norms and their safe performance. The H2B were working in the gold standard of shipyard safety, the opposite of the work environment of trafficked employees.

40. **Absence of Attention to their Health**

Signal's attention to the health of its workers is not consistent with traffickers. Rather, the H2B workers, as direct employees of Signal, had medical insurance, an attribute not shared with many American workers in Texas and Mississippi who lack employer-paid benefits, which is especially the case with blue-collar workers.

---

[33] Shipbuilders Council of America announcements. See criteria for the award and Signal's further recognition in 2012 at https://shipbuilders.org/sca-announces-2012-safety-awards.

Signal provided all its Indian workers with medical insurance, invited them to fairs

concerning health benefits (according to internal corporate emails) and transported them

to doctors, and provided translators and transport for these medical visits to ensure that

the workers stayed healthy or were even treated for very serious illnesses such as cancer.

In 2007, only 53.9 percent of blue collar Americans had medical insurance from their

employers (see Table 3 in Appendix IV). The rates of insurance were especially low

Only 44.1 percent of American construction workers in 2007 had health insurance.

At the time that Signal's H2B workers were receiving insurance, they were working in

the states  of Mississippi and Texas where employers  post-2000 were less likely to

provide medical insurance to their workers. In 2001, the starting point for the analysis,

only 60 percent of employers in Mississippi and Texas provided health benefits to their

workers. This figure declined annually in these states post-2000. Therefore the

H2Bworkers at Signal were provided medical insurance that at least 40 percent of

American employees in these two states were not receiving.[34]

41. The access to medical insurance by the H2B workers contrasts sharply with the

environments where they came from. The UAE is only now in 2014 requiring that

employers provide health insurance, and it is only being phased in at the present time.[35]

In India, in 2003-4, shortly before the Indian workers arrived in the US, only 55 million

Indians had health insurance and only now are one-quarter of Indians covered.[36]

---

[34] Elise Gould, "Employer Sponsored  Health Insurance Coverage Continues to Decline
in the New Decade," Briefing Paper 353, December 5, 2012,
http://www.epi.org/publication/bp353-employer-sponsored-health-insurance-coverage/
[35] http://www.thenational.ae/uae/health/dubais-mandatory-health-insurance-law-comes-into-force#ixzz38D6NcBTV.
[36] The World Bank, "Government -Sponsored Health Insurance in India: Are You
Covered?," August 26, 2012,

Therefore, their situation at Signal was significantly different from what they had known in India or in their work abroad.

42. The U.S. State Department Trafficking in Persons Report for 2012 identifies Common Methods of Control of Victims by Human Traffickers. They are divided into the following three categories: Restriction of Movement, Harmful Living Conditions and Harmful Working Conditions[37].

43. The restrictions of mobility identified by the U.S. State Department are not present. These restrictions are listed as follows: 1) confiscating passports, visas and/ or identification documents 2) Constantly accompanying the victims, insisting on answering questions on behalf of the victim, and or translating all conversations 3) Isolating the victim by not disclosing his or her location or address 4) Requiring the victim to live and work in the same location

44. The Indian H2B workers did not have their passports or visas confiscated, rather Signal employees went to great effort to ensure that their I-94 forms were in order even it meant driving them significant distances. The victims were not constantly accompanied, and translation was usually provided by another H2B visa worker. Signal had a bus service and provided transport to the workers 24/7; many of them both legally and illegally obtained drivers' licenses (many traveling to the Chicago area where they obtained licenses where they were not resident), many bought cars. Signal provided them parking spaces near to the trailers, where they were housed, in order that they had convenient parking. Some went out and purchased expensive new cars. The H2B

---

http://documents.worldbank.org/curated/en/2012/08/16653451/government-sponsored-health-insurance-india-covered.

[37] U.S. Department of State, Trafficking in Persons Report June 2012 (Washington, D.C.: U.S. Department of State, 2012), 17.

workers were clearly known to Signal and many of them continue to receive their mail at Signal long after their departure.  Initially, workers at Signal were required to live in the man camp, but this was not a requirement after the initial housing contract. At the time, there was little or no alternative housing on the market.[38]

45. Workers were not restricted in their mobility and travelled around the United States during their vacations, including trips to the beach, to Disneyland and to Chicago and other communities where there were Indian communities. Some of the workers travelled back to India to see their family members, or to attend funerals following the death of a family member.

46. Traffickers not only restrict mobility but try to isolate the victims, according to the TIP report. In contrast with this, Signal did everything to try and allow communications. Multiple telephones were installed at the man camp for which workers could purchase phone card. Workers also saved and bought computers which allowed them to readily and affordably communicate with their families at home through the internet and the free Internet service provided at the man camp.

47. The traffickers were not deliberately kept in isolation, and no attempt was made to hide their whereabouts from the outside world.  Many trafficking victims are so afraid of their traffickers that they seek to hide their new locale from their traffickers. But there are large amounts of mail arriving for the former H2B workers at Signal even today, some of it from banks and local government. This suggests that the individuals were not seeking to hide sensitive information from Signal that could then determine their whereabouts.

---

[38] Turnham et.al.

48. Harmful living conditions specified by the TIP report include 1) restricting access to food and appropriate clothing, b) forbidding access to appropriate medical care, 3) not allowing time off or sufficient time to sleep

49. The workers at Signal had access to food in the cafeteria that was available before and after their work shifts. They had work clothes and could go on the shuttle bus to Walmart, which they did to purchase additional clothing at affordable prices. As previously mentioned, the Indian H2B workers not only had access to appropriate medical care, but work provided medical insurance.

50. The last element of control associated with human trafficking, according to the 2012 TIP Report, are harmful working conditions. The elements of this are: in exchange for work opportunity, charging a large employment fee that is difficult or impossible to pay off; requiring unusually long work hours with few or no breaks; restricting the number of days off; providing little to no pay or irregular pay.

51. Signal did not charge the workers any employment fee, and when they learned of the situation with the recruiter, they broke off their relationship with Pol. They tried to accommodate the workers, even those without the appropriate job skills, and give them some kind of employment that would provide them pay and allow them to pay off their debt.

52. Signal workers worked the same hours under the same conditions as American workers that were in compliance with U.S. government regulations. The Signal employees, as regular employees of the company, had vacation time, like their American co-workers.  The workers had salaries way above the minimum wage, at $18 an hour with 50 percent premium for overtime.  Many of them received safety bonuses on top of

this. There was direct deposit of their checks into the bank so that there was no delay in payment, no possibility of loss through theft, and no expense of cashing checks.

53. In addition to these delineated criteria, I would also delineate another characteristic of trafficking that my research has revealed. As I wrote in my human trafficking book, some smugglers and traffickers do everything they can do economize on their expenditures for their victims. In reviewing the thousands of Signal emails, I saw nothing in them reflecting any effort to economize on the workers or to shortchange them. Rather, in one case, I read of discussions of what to do with a worker with clogged arteries who was on life support at the hospital. Signal was having internal discussions on whether to spend $130,000 to fly him home on an equipped medical jet to India so that his wife could say goodbye to him, as she did not have a visa to the United States nor could she obtain one rapidly. When I asked Signal management what was the outcome of this sad situation, I was informed that Signal had flown home the worker at this cost, and his wife had been able to bid him farewell and detach him from life support.  This is not the behavior of an inhumane organization that is engaged in trafficking or lacks concern for its employees.

54. The major problems faced by the workers  at Signal was their indebtedness in India, the unscrupulous recruiter they dealt with in India, and the absence of regulations and protections by the Indian government for workers seeking to travel overseas.  Kerala, the source region of most of Signal's H2B visas, did not have a government information office on migration until 2008, after the period of employment at Signal was over.[39] India presently has such serious problems of sex trafficking and labor trafficking, particularly of child trafficking, that it has failed to address the problem of overseas recruitment in

---

[39] http://moia.gov.in/services.aspx?ID1=325&id=m3&idp=92&mainid=73, the government website reveals that migrant center in Kerala was established only in 2008.

any meaningful way. As a United Nations publication from 2011 points out, there is limited oversight of employment recruiters[40].

55. Signal also faced a serious information deficit at the time that it was approached by Pol and Burnett as to the problems of recruitment of overseas workers. While there is more information now available, there was not publicly available information in 2006 when they chose to enter into the H2B visa program. Only in 2009, long after the H2B visa had already ended at Signal, did the US State Department in its 2009 Trafficking in Person Report place India on the Tier 2 Watch list for trafficking because of its inattention to victims of trafficking. It wrote in reference to unskilled labor, "In some cases, such workers are the victims of fraudulent recruitment practices committed in India that lead them directly into situations of forced labor, including debt bondage; in other cases, high debts incurred to pay recruitment fees leave them vulnerable to exploitation by unscrupulous employers in the destination countries."[41] Yet this analysis makes no reference to high-skilled workers which is what Signal recruited. Therefore, there was no official government advice on the topic of recruitment.

56. At the present time, a prospective employer of H2B workers could go to the website of Verité, a non-profit that advises employers on supply chains and labor practices

---

[40] UNODC, UN Women, UN Gift (Global Initiative to Fight Human Trafficking), (principal author Sarasu Esther Thomas), "Responses to Human Trafficking in Bangladesh, India, Nepal and Sri Lanka," 2011, BangladesUNhttp://www.unodc.org/documents/human-trafficking/2011/Responses_to_Human_Trafficking_in_Bangladesh_India_Nepal_and_Sri_Lanka.pdf, p.38.
[41] United States Department of State, Trafficking in Person Report, 2009, http://www.state.gov/j/tip/rls/tiprpt/2009/123136.htm.

overseas. They now have a website to advise on problems of recruitment.[42] This webpage was put up in the last year. Every reference and report in this section of the website was prepared after Signal recruited its H2B workers. Therefore, there was no accessible information in either print or web form to advise a corporation on the risks of recruiting temporary workers overseas.

57. In conclusion, Signal did not have access to information that would allow it to be aware of the problem of recruiters making false promises to its potential workers in India. Neither, did it have a reason to suspect that the local lawyer and recruiter would be engaged in duplicitous practices. Signal was not engaged in human trafficking at any stage of the process with the H2B workers, either at recruitment, on their arrival in the United States or in their employ.

Respectfully Submitted,

___/s/Louise Shelley_____

Louise Shelley                                          Date

---

[42] I have worked with the founder and director of research at Verité through our anti-human trafficking initiative of the World Economic Forum. See their general website at: http://www.verite.org.

31

**Louise Shelley**

**Appendix I – Materials Consulted**

Louise Shelley  Appendix I

**Materials that I have reviewed:**


**Legal Materials:**

1)8 U.S. Code § 1324b

2)1956 United Nations <u>Supplementary Convention on the Abolition of Slavery</u>

3) TVPA Legislation  Trafficking Victims Protection Act 2000 and subsequent reauthorizations in 2003, 2005, 2008 and 2011

4) UN Protocol United Nations Convention against Transnational Organized Crime and the Protocols Thereto,  including the Protocol to Prevent, Suppress and Punish Trafficking in Persons

**Documents From the Case and related investigations**

 5) Kurian David et. al vs. Signal SIGNAL INTERNATIONAL LLC, MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., INDO-AMERI SOFT L.L.C., KURELLA RAO, J & M ASSOCIATES, INC. OF MISSISSIPPI, GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS), First Amended Complaint,  April 29, 2008

6) Exhibit I, Part 1I, Specific Fraud Allegations Related to Class Representatives 4/29/2008

7) Third Kurian David et. al vs. Signal SIGNAL INTERNATIONAL LLC, MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., INDO-AMERI SOFT L.L.C., KURELLA RAO, J & M ASSOCIATES, INC. OF MISSISSIPPI, GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS), Third Amended Complaint 9/21/12

8) Third Amended Complaint,Exhibit 1, Specific Fraud Allegations Related to Named Plaintiffs ("RICO Fraud Chart") 9/21/12

9) ANSWER, AFFRIMATIVE DEFENSES AND CROSS CLAIMS OF
SIGNAL INTERNATIONAL, L.L.C. TO THIRD AMENDED COMPLAINT 1/11/13

10) Signal Answer to 3rd Amended Complaint 3/1/13

11) Fifth Amended Complaint 4/11/14

12) Exhibit 1 to Fifth Amended Complaint, "Rico Fraud Chart", 4/11/14

13) Exhibit II

14) Kurian David et. al. vs. Signal International, ORIGINAL MEMORANDUM OF
SIGNAL INTERNATIONAL
IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
February 11, 2011

15) Opinion of Judge  Jay C. Zainey, in Kurian David et. al. vs. Signal International,
denying class certification,  United States District Court, State of Louisiana, Jan 3, 2012

16) letter  from Patrick Shen, Deputy Special Counsel,  Office of Special Counsel, Unfair
Immigrated-related practices of the Civil Rights Division of the Department of Justice on
March 14, 2008.

**Signal International**

The following documents and information were reviewed:

17) Thousands of relevant internal emails

18) Payroll of all workers paid less than $18 an hour

19) Safety record of Signal relative to the industry at large
Award notification for its safety awards

20) Reports on the injuries of Indian workers

21) videos of the mancamps at Pascagoula, Miss. And Orange, Texas

**Books Reviewed**

22) Ato Quayson and Antonela Arhin, eds.  *Labour Migration, Human Trafficking and
Multinational Corporations : The Commodification of Illicit Flows* (Abingdon, Oxon and
New York, Routledge, 2012).

23) John Bowe**,** *Nobodies: Modern American Slave Labor and the Dark Side of the New Global Economy* (New York: Random House, 2007).

24) Kevin Bales, *Disposable People: New Slavery in the Global Economy* (Berkeley and Los Angeles: University of California Press, 1999).

25) Kevin Bales and Ron Soodalter, *The Slave Next Door: Human Trafficking and Slavery in America Today* (Berkeley and Los Angeles: University of California Press, 2009).

26) David Kyle and Rey Koslowski, eds. *Global Human Smuggling: A Comparative Perspective*  (Balitmore and London:Johns Hopkins University Press, 2001).

27) Louise I. Shelley, *Human Trafficking: A Global Perspective* (New York and Cambridge, 2010).

**Reports:**

Liliana Sorrentino & Anniina Jokininen, *Guidelines to prevent abusive recruitment, exploitative employment and trafficking of migrant workers in the Baltic Sea region* (Helsinki*:* European Institute for Crime Prevention and Control,
affiliated with the United Nations (HEUNI), 2014).

All other materials are included in footnotes in the report.

**Louise Shelley**

**Appendix II – Signal Safety Record**

       **II.A – Signal safety graphs**

       **II.B – Signal safety award**







For the sixth year the "Excellence in Safety Award," was earned by Signal International from the Shipbuilder's Council of America. Accepting the 2009 award for Signal was Pat Killeen, Corporate Director of Environmental Health and Safety for Signal International, LLC.

The Shipbuilders Council of America is the largest and most broad-based national trade association representing the US shipyard/marine construction industry. More than 43 companies operating over 100 shipyards and marine facilities comprise its membership.

Each year the Council issues safety awards to companies whose incident rates are below the association's collective average. For the calendar year of 2009, Signal had a total OSHA recordable incident rate of 0.50, compared to the industry average of 6.8. Thus far in 2010, Signal company-wide has an incident rate of 0.38.



Pat Killeen (center), Director of EHS for Signal International, LLC is shown with Ian Bennitt (left), Manager, Government Affairs - Shipbuilders Council of America and Matt Paxton, President – Shipbuilders Council of America, receiving the 2009 award.

**Louise Shelley**

**Appendix III - Bureau of Justice Statistics Report on Incidence of Human Trafficking**

## Confirmed victims of labor trafficking were more likely to be male, older, and foreign than confirmed victims of sex trafficking

Federally funded high data quality task forces entered 389 confirmed incidents of human trafficking during the study period. These cases had consistently complete reporting on case outcome and individual-level information. The selected task forces identified 527 confirmed human trafficking victims in the 389 confirmed incidents. Confirmed sex trafficking victims were overwhelmingly female (94% of victims with known gender). Of the 63 confirmed labor trafficking victims, 20 were male and 43 were female (table 5).

Confirmed labor trafficking victims were more likely to be older than confirmed sex trafficking victims. Sixty-two percent of confirmed labor trafficking victims were identified as 25 years of age or older, compared to 13% of confirmed sex trafficking victims, based on victims with known age.

In addition, confirmed labor trafficking victims were more likely to be identified as Hispanic (63% of victims with known race) or Asian (17%) compared to sex trafficking victims, who were more likely to be white (26%) or black (40%). Four-fifths of victims in confirmed sex trafficking cases were identified as U.S. citizens (83%), while most confirmed labor trafficking victims were identified as undocumented aliens (67%) or qualified aliens (28%).

## More than half of confirmed sex trafficking suspects were black, while confirmed labor trafficking suspects were more likely to be Hispanic

Overall, individual information was collected for 488 suspects in confirmed human trafficking incidents in high data quality task forces (table 6).

**TABLE 5**
**Victim characteristics in cases confirmed to be human trafficking by high data quality task forces, by type of trafficking**

| Victim characteristic | Total[a] | Sex trafficking | Labor trafficking |
|---|---|---|---|
| **Sex** | | | |
| Male | 49 | 27 | 20 |
| Female | 477 | 432 | 43 |
| **Age** | | | |
| 17 or younger | 257 | 248 | 6 |
| 18-24 | 159 | 142 | 17 |
| 25-34 | 68 | 46 | 22 |
| 35 or older | 27 | 12 | 15 |
| Unknown | 16 | 12 | 3 |
| **Race/Hispanic origin** | | | |
| White[b] | 106 | 102 | 1 |
| Black/African American[b] | 167 | 161 | 6 |
| Hispanic/Latino origin | 129 | 95 | 34 |
| Asian[b, c] | 26 | 17 | 9 |
| Other[b, d] | 35 | 23 | 11 |
| Unknown | 63 | 61 | 2 |
| **Citizenship** | | | |
| U.S. Citizen/U.S. National | 346 | 345 | 1 |
| Permanent U.S. resident[e] | 6 | 6 | 0 |
| Undocumented alien[f] | 101 | 64 | 36 |
| Qualified alien[e] | 19 | 1 | 15 |
| Temporary worker | 2 | 0 | 2 |
| Unknown | 50 | 41 | 9 |
| **Number of victims identified** | 527 | 460 | 63 |

Note: Analysis restricted to cases opened and observed between January 2008 and June 2010 in high data quality task forces. See definition of high data quality task forces on page 5.
[a]Includes cases of unknown trafficking type.
[b]Excludes persons of Hispanic or Latino origin.
[c]Asian may include Native Hawaiian and other Pacific Islanders or persons of East Asian or Southeast Asian descent.
[d]Includes persons of two or more races.
[e]Permanent residents and qualified aliens are legal residents in the U.S., but do not have citizenship.
[f]Undocumented aliens reside in the U.S. illegally.

**TABLE 6**
**Suspect characteristics in cases opened between January 2008 and June 2010 and confirmed to be human trafficking by high data quality task forces, by type of trafficking**

| Suspect characteristic | Total[a] | Sex trafficking | Labor trafficking |
|---|---|---|---|
| **Sex** | | | |
| Male | 368 | 314 | 54 |
| Female | 88 | 71 | 17 |
| Unknown | 32 | 25 | 7 |
| **Age** | | | |
| 17 or younger | 11 | 10 | 1 |
| 18-24 | 147 | 145 | 2 |
| 25-34 | 114 | 105 | 9 |
| 35 or older | 100 | 65 | 35 |
| Unknown | 116 | 85 | 31 |
| **Race/Hispanic origin** | | | |
| White[b] | 24 | 22 | 2 |
| Black/African American[b] | 224 | 219 | 5 |
| Hispanic/Latino origin | 119 | 89 | 30 |
| Asian[b, c] | 28 | 18 | 10 |
| Other[b, d] | 20 | 5 | 15 |
| Unknown | 73 | 57 | 16 |
| **Citizenship** | | | |
| U.S. Citizen/U.S. National | 276 | 269 | 7 |
| Permanent U.S. resident[e] | 12 | 2 | 10 |
| Undocumented alien[f] | 44 | 39 | 5 |
| Qualified alien[e] | 8 | 2 | 6 |
| Unknown | 148 | 98 | 50 |
| **Number of suspects identified** | 488 | 410 | 78 |

Note: Analysis restricted to cases opened and observed between January 2008 and June 2010 in high data quality task forces. See definition of high data quality task forces on page 5.
[a]Includes cases of unknown trafficking type.
[b]Excludes persons of Hispanic or Latino origin.
[c]Asian may include Native Hawaiian and other Pacific Islanders or persons of East Asian or Southeast Asian descent.
[d]Includes persons of two or more races.
[e]Permanent residents and qualified aliens are legal residents in the U.S., but do not have citizenship.
[f]Undocumented aliens reside in the U.S. illegally.

**Louise Shelley**

**Appendix IV - Employer Sponsored Health Care for Blue Collar Workers**

| TABLE 3 |
| --- |

**Employer-sponsored health insurance coverage\* for "strongly attached" private-sector workers,\*\* by occupation, firm size, and industry, 2000–2011**

| | SHARE WITH ESI | | | | PERCENTAGE-POINT CHANGE | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2000** | **2007** | **2010** | **2011** | **2000–2007** | **2007–2011** | **2010–2011** | **2000–2011** |
| *All workers* | 58.9% | 55.4% | 53.1% | 52.3% | -3.5 | -3.1 | -0.9 | -6.6 |
| **Occupations** | | | | | | | | |
| *White collar* | 65.0% | 61.9% | 60.0% | 59.3% | -3.1 | -2.6 | -0.7 | -5.7 |
| *Blue collar* | 59.0% | 53.9% | 51.6% | 51.5% | -5.1 | -2.4 | -0.2 | -7.5 |
| *Service* | 33.9% | 29.5% | 26.1% | 24.1% | -4.4 | -5.4 | -2.0 | -9.9 |
| **Firm size** | | | | | | | | |
| *Nine or fewer* | 30.6% | 27.1% | 26.3% | 24.6% | -3.5 | -2.5 | -1.8 | -6.0 |
| *10 to 99* | 50.6% | 46.7% | 43.6% | 42.0% | -3.9 | -4.7 | -1.6 | -8.6 |
| *100 to 499* | 65.9% | 63.1% | 61.5% | 59.8% | -2.8 | -3.3 | -1.8 | -6.1 |
| *500 to 999* | 67.1% | 64.9% | 62.1% | 62.7% | -2.2 | -2.2 | 0.6 | -4.4 |
| *1,000 plus* | 69.9% | 67.5% | 64.9% | 64.4% | -2.4 | -3.1 | -0.5 | -5.5 |
| | **2002** | **2007** | **2010** | **2011** | **2002–2007** | **2007–2011** | **2010–2011** | **2002–2011** |
| **Industry\*\*\*** | | | | | | | | |
| *Agriculture, forestry, fishing, hunting* | 37.1% | 27.1% | 24.8% | 22.8% | -10.0 | -4.3 | -2.0 | -14.3 |
| *Arts, entertainment, recreation, and accommodation* | 32.5% | 31.9% | 26.8% | 25.4% | -0.6 | -6.5 | -1.4 | -7.1 |
| *Construction* | 47.5% | 44.1% | 42.2% | 43.4% | -3.4 | -0.7 | 1.2 | -4.1 |
| *Education, health, and social services* | 59.4% | 60.2% | 57.0% | 56.0% | 0.8 | -4.2 | -1.0 | -3.4 |
| *Finance, insurance, and real estate and leasing* | 65.8% | 65.1% | 65.4% | 65.5% | -0.7 | 0.4 | 0.1 | -0.3 |
| *Information* | 73.0% | 72.7% | 69.4% | 71.3% | -0.3 | -1.4 | 1.9 | -1.7 |
| *Manufacturing* | 72.7% | 70.2% | 68.6% | 67.8% | -2.5 | -2.4 | -0.8 | -4.8 |
| *Mining* | 78.4% | 73.9% | 72.6% | 71.4% | -4.5 | -2.5 | -1.2 | -7.0 |
| *Other services (except public administration)* | 40.1% | 37.4% | 35.5% | 34.4% | -2.7 | -3.0 | -1.1 | -5.7 |
| *Professional, scientific, management, and administration* | 57.4% | 56.0% | 56.1% | 53.4% | -1.4 | -2.6 | -2.7 | -4.0 |
| *Transportation and communication* | 66.9% | 63.0% | 61.4% | 61.7% | -3.9 | -1.3 | 0.3 | -5.2 |
| *Wholesale trade* | 53.9% | 51.6% | 48.5% | 47.9% | -2.3 | -3.7 | -0.7 | -6.0 |

\* To qualify as employer-sponsored health insurance coverage, workers must receive employer-sponsored health insurance through their own job, and employer must pay at least part of their insurance premiums.

\*\* Defined as private-sector wage and salary workers, age 18–64, who worked at least 20 hours per week and 26 weeks per year

\*\*\* Industry classification changes make it impossible to compare 2011 with years earlier than 2002.

**Source:** Author's analysis of Current Population Survey Annual Social and Economic Supplement microdata